Thank you. The next argued case is number 19-2326, Oracle America, Inc. v. United States. Mr. Holman, proceed. Good morning. May it please the Court. Craig Holman for Oracle America, Inc. The United States Court of Federal Claims correctly found that DOD's 10-year, $10 billion, single-award, JEDI cloud procurement with near-constant technology refresh provisions violates 10 U.S.C. 2304a's prohibition on large, single-award, indefinite delivery, indefinite quantity contracts. Well, it's not an absolute – you're not saying it's an absolute prohibition, or are you? But rather that it's something to be given significant weight. Your Honor, we believe it is indeed a prohibition with four exceptions to it, and DOD invoked one of those exceptions incorrectly, as the lower court found. Our contention here on appeal is that the lower court indeed then went forward and erred, breaking with extensive Supreme Court and Federal Circuit precedent when assessing the harmless error or competitive prejudice as it is known in bid protests. So I'll touch on this in greater detail as you like, or I'm happy to now, Your Honor. Counsel, if we agree with you that the explanation or the exception relied upon was incorrect, could DOD just go back and rely on a different exception? Well, I mean, the exception would have to fit, Your Honor, and we don't know whether DOD indeed would even try to do that. You know, we've had two different Congresses speak out against the single award structure. There's no reason to believe that this were remanded because the exception selected doesn't fit, that DOD would just try to do it again. Why wouldn't that be a determination that DOD would be in the best position to make?  What I mean is that you're suggesting that it's unlikely that DOD would select one of the other exceptions, but your argument is that we can't make a determination of harmless error under Tenery, but if we were to remand to DOD for the undersecretary to make a determination as to whether, absent the exception that was invoked, she would have invoked one of the other exceptions, isn't that a determination that DOD would be free to make? I do believe DOD could make that determination undersecretary for solicitation, I would think. It would just be, had we known that we couldn't invoke the exception that we invoked, we would have invoked another exception, and then your argument would simply be limited. It would seem to me to saying that the invocation of the other exception was invalid. I think that's correct, Your Honor. I mean, the very teaching of SEC versus Chenery is that this court, neither this court nor the lower court could take that discretion away from DOD. So how the Department of Defense would exercise that discretion on remand, I'm not arguing for this court to take that discretion from DOD. I am telling this court that DOD didn't choose any of the other exceptions. This was in front of DOD, and they didn't believe that any of the other shoes fit the circumstance, and any of the other exceptions worked here. So there is no basis for anybody to assert what DOD might or might not do on remand. My belief is that certainly it could go back down, and certainly if they were to exercise discretion under another one of the exceptions, the case could come back, but none of that is an appropriate role for a court in this environment, and that's what SEC versus Chenery tells us. Indeed, that's the very error that's a little bit different that the judge made below on prejudice. You have a second harmless error problem to get over, don't you, and that is the trial court's conclusion that even if there had been a multi-source selection, that gate 1.2 still would have been in place, and you would not have been able to succeed in getting the procurement, and the judge found that that was based on evidence, substantial evidence in the record that that is exactly what would have happened, and so isn't that a separate harmless error argument from the 2304A harmless error argument? Yes. Well, first of all, I don't think 2304A exceptions can be characterized as harmless error because we don't know what DOD would do on remand, and there's no evidence that DOD would take one of these other exceptions, but as to the prejudice question, Your Honor, I think it suffers from the exact same SEC versus Chenery flaw that you just mentioned, so if we're sitting here talking about what DOD would do on remand, so if this goes back, Congress put this prohibition in place precisely to stop IT contracts with technology refresh provisions like this one. If this thing goes back to DOD, the question that Judge Brugink and Mr. Rayl were discussing, that Judge Brugink colorfully called Rayl on the facts and Mr. Rayl acknowledged was not in the record, is how would DOD structure this on remand? How would DOD structure this procurement if it were complying with 10 U.S.C. 2304A? And as soon as the lower court started engaging in that type of decision-making, it was breaking with SEC versus Chenery. There is nothing in the record about how DOD would structure a multiple award procurement. That's a decision that DOD would make on remand under SEC versus Chenery. And it is also worth noting that we have four different reasons why that prejudice finding is wrong, Your Honor. Let me ask you then about that. You say there's nothing in the record that indicates what the department would have done in a multisource selection, but if you look at Appendix 100462, that is the memorandum for the contracting officer's file, and that's the contracting officer and Mr. Van Ame are the signatories. And the finding that's made is that I find that multiple awards increase security risks. So the trial courts found, based on that, that there would be essentially no likelihood that the security provision in Gate 1.2 would be relaxed if there were multiple sources. What's wrong with that conclusion? There's two flaws with that conclusion. One, that is not the basis on which the Department of Justice asserted that the security issue would remain the same. Indeed, it's a completely different document than was pointed to by the Department of Justice with respect to that. But second of all, that is a finding that was made in the rationale in connection with a single award decision. It is not a description of what would be the right approach with a multiple award. And indeed, there is nothing in the record that would do that. What we have shown, what we showed below in the lower court, was that DOD has entirely different guidelines for how to structure a multiple award than it does for a single award. And what the record does show, Your Honor, is there are multiple other procurements that DOD hand-selected to pattern this procurement after, and none of them are structured this way. Counsel, this is Judge O'Malley. So as I understand it then, you don't need us to conclude that Gate 1.2 is unenforceable as written because you believe that there's no way for us to know for sure that Gate 1.2 would be re-employed with the same language in a multiple source contract. Is that right? I believe that's absolutely correct, Your Honor. And I also assert that when Judge Brugank talked about 1.2 and when he applied the question about 1.2, he did it at the wrong point in time. This court has repeatedly spoken to the issue of pre-award protest and prejudice and what you need, the question you need to ask. And the question Judge Brugank should have asked was could, even if he thought 1.2 remained, was could, based on the record in front of me, Oracle meet 1.2 on remand? This is exactly addressed precisely by the Federal Circuit in comment. Counsel, what's your response to the argument that there's a difference between pre-bid protests and protests that are made after a bid has been submitted so you know who the players are, you know what their qualifications are, and you know whether they can satisfy the gates? I think that's a false argument in this context by the Department of Justice, first of all, because the question is on this particular issue, on remand, could Oracle meet gate 1.2? And neither the Department of Justice nor the Court of Federal Claims ever addressed that. What Oracle's evidence presented was that – what the evidence was presented was that Oracle couldn't meet it in September 2018. What Oracle said in its proposal to the government was that it was on the cusp of meeting it, and indeed today it far exceeds that standard. And, you know, the question that the Court should have been asking is on remand, if gate 1.2 is left in this procurement, could Oracle meet it? And the Court never asked that question. What it looked at is could it meet it in September 2018, which was itself an error under Common and Impreza. Can I ask a question? Sure. Counsel, before you sit down, I have one more question. I'm sorry. Is that okay, Judge Newman? Of course, and I have a question, too, about gate 1.2. Okay. Please proceed. So is it your theory under a proper application of Chenery that we wouldn't even be permitted to address your argument that 1.2 is unenforceable unless we get two or three steps farther down the road? I think – no, Judge, because we have a separate account attacking 1.2. I don't have to win on 1.2 to win on 2304A is what I was trying to say. But we do have a separate count that 1.2 in itself is a violation of the Competition and Contracting Act because by that gating factor, DOD, which is part of FedRAMP – remember, this is a – FedRAMP is a Department of Defense U.S. government tool. By setting these gates, DOD precisely knew who could meet them, and that it was AWS and Microsoft. It was – this solicitation was no different than DOD putting out a solicit – when it put that gate 1.2 in, it was no different than DOD saying to the world, only AWS and Microsoft may bid because it was their gate, their system, they knew who met it, and they knew only those two companies did. That's why this competition went from 60-plus interested participants down to only four, four of the largest cloud computing companies in the world bidding, and two of them, Oracle and IBM, were out on these gates. DOD knew from the get-go that only AWS and Microsoft could clear these gates, and they never complied with Competition and Contracting Act's rules for restricting competition. And so, Your Honor, we do think these are separate issues. We think gate 1.2 clearly falls on its own. But even if gate 1.2 doesn't fall, we still went on 2304A because the lower court never should have been asking the question, how would DOD restructure this procurement on remand? That's the exact thing SEC v. Chenery and countless other courts say they can't do. That's not a harmless error finding. That's the lower court intruding onto DOD's discretion. It's doing exactly what the Supreme Court said in SEC v. Chenery could not happen. Okay. Now, that was the point that I wanted to raise, that really the court must consider the points that you've been making about gate 1.2 and the fact that it was established in the original procurement. But without that, you really can't prevail. Isn't that right? If gate 1.2 falls, we win, Your Honor, clearly because it needs to go back and be restructured. If you were to rule against us on gate 1.2, the court would still have to consider 2304A because we can pass gate 1.2 today. And that's what we were telling the lower court. That's what we've been saying all along. They set this gate at a particular point in time, Your Honor. They set this gate September 2018 when Oracle was on the cusp of getting FedRAMP high, an even higher standard. And they said that you had to meet it at the time of bid submission. So if this case went back on – even if gate 1.2 were in a multiple award solicitation today, Oracle would pass it easily, easily. So if it went back down on remand, and this is what the judge was – one of the things that the judge was doing wrong on prejudice. There were a bunch of things, unfortunately, that were done wrong on prejudice because the Department of Justice invited the judge to engage in this speculation. But one of the other things was he was applying the prejudice test at the wrong time. It's quite clear in Comet and Empresa that the question is could Oracle meet this on remand, not did Oracle meet it in the original flawed procurement. And that's what the judge was talking about, that we couldn't meet it under the original flawed procurement. And the evidence was ample. There was no conflicting evidence that Oracle could meet it if it got remanded. Okay, thank you. Any more questions at the moment from this gentleman? Okay, then we'll hear from Mr. Rayl. Thank you, Judge. Thank you, Your Honor. May it please the Court. It's undisputed that the JEDI cloud acquisition is an important, high-value procurement with significant implications for our national defense. For this reason, the Joint Requirements Oversight Council, led by the Vice Chairman of the Joint Chiefs of Staff, issued warfighting requirements for the procurement in December 2017. And the solicitation implementing those requirements has been thoroughly reviewed by numerous stakeholders within DOD to ensure that it accurately reflects the government's requirements. Oracle admits that it failed to meet multiple minimum requirements set forth in the solicitation, including one related to data security, which is contained in Subfactor 1.2. The trial court correctly determined that Oracle has not demonstrated anything irrational or illegal about Subfactor 1.2, so the trial court correctly found that Oracle was not prejudiced by any of its other alleged errors. Now, since prejudice was the main topic of discussion in Mr. Holman's argument, I'll go through it there. Here, the trial court, because the trial court correctly determined that the FedRAMP moderate authorization requirement is enforceable, and Oracle admits that it didn't meet this requirement, the trial court correctly found that Oracle was not prejudiced by any other alleged errors, including- So, is it your point-so, your point is that if we don't agree that the mere fact that it-if we don't agree with counsel that he is entitled to a remand regardless of the gates, because the gates might be considered-or reconsidered by DOD-if we don't agree with that, then your view is we need to remand to the trial court if we find 1.2 unenforceable. Is that right? If the court were to find 1.2 unenforceable, yes, the court would need to remand to the trial court. But the court-obviously, our position throughout our briefs is that 1.2 is, in fact, enforceable, that there's a rational basis for these terms, that there was-there's no violation of SECA here. This was full and open competition. Everyone was permitted to submit proposals. It's not correct to say that the agency knew that only Amazon and Microsoft could compete because there was the opportunity for teaming arrangements in the solicitation. But nevertheless, that's not- But you're not saying-you're not asking us to assume that they didn't know, and in fact, wouldn't it be quite extraordinary if, in fact, with something as significant that in setting the standard there wasn't some sense as to how the public contributors can comply with that standard? It just seems to be extraordinarily rigorous for a so large a solicitation. Sure, Your Honor. That's fair. My only point there was that it's possible there could have been teaming combinations and the agency didn't know what that was. But nevertheless, our main point is that it doesn't matter whether the agency knew that Amazon and Microsoft were the only ones that could meet this requirement because they provided for a solicitation with full and open competition. The question here, as cases like CHE Consulting, Savantage demonstrate, is that the question is whether the terms that are in the solicitation, this gate 1.2 in particular that we're talking about now, was unduly restrictive of competition because it lacked a rational basis. You know, CHE Consulting is a great example there where the plaintiff alleged that an agency's decision to include both hardware and software maintenance requirements in a solicitation violated CEQA's full and open competition requirement because only one company and its licensees supported the software for the system at issue. But the question isn't just whether it was unduly restrictive, but the question is, is it a specification requirement or a qualification requirement, right? That is a separate issue, Your Honor. That's correct. And there's two points on the qualification requirement issue. One, Oracle waived this objection by not raising it prior to the close of bidding. And second, subfactor 1.2 is a JEDI-specific evaluation criterion. It's not a qualification requirement. So, Oracle did not raise, prior to October 12, 2018, the close of bidding for this procurement, the proposal submission deadline. It didn't raise an argument that subfactor 1.2 or any other subfactor violated 10 U.S.C. 2319, which contains the requirements if you want to implement a qualification requirement. But it did object to 1.2, did it not? Absolutely, Your Honor. Yes, Oracle did object to 1.2 on the grounds that it was unduly restrictive of competition. Oracle did not object on the grounds that it violated a separate statute, a separate requirement, the 2319 qualification requirement. That objection didn't come until after the close of bidding, which Blue and Gold and its progeny teaches is too late to raise that objection. The main argument they make on appeal is that they referenced prequalification in a pre-October 12th GAO filing. But for one thing, they didn't raise that argument in their briefing below. And the other point is that there's still no reference to 2319. They didn't say this is an illegal qualification requirement. They called it prequalification because they're saying that it exceeds DOD's legitimate needs because it required FedRAMP moderate authorization at the time of proposal. Right. Well, that's exactly what the distinction between a qualification requirement and a specification requirement is. If it isn't necessary for the particular program or the particular contract, then it becomes a qualification requirement, right? No, Your Honor. If it's not necessary for the particular program, it would be unduly restrictive of competition because it's not necessary to meet the agency's minimum needs. It's like two sides to the same coin, right? No, Your Honor. A qualification requirement is something different. A qualification requirement is a systemized quality assurance demonstration requirement on a continuing basis as an eligibility for award. That's what the Court of Federal Claims, the GAO have explained. So, in other words, a qualification requirement is something outside of a particular procurement that potential contractors are required to meet, some sort of testing or quality assurance program that contractors are required to meet in order to be eligible to compete for future procurements for that particular. It's usually products for that particular product. Like you would have your heat exchanger or something for an aircraft tested, go through this process in order to show that you're able to provide this to the government and then the government will issue solicitations and say that you have to have met this qualification requirement to be in there. Only three people are eligible to compete if they're on this qualified products list or if they're an approved source pursuant to the qualification requirement. That's not what we have here. What we have here is a JEDI-specific requirement, subfactor 1.2. I mean, Oracle admits itself that FedRAMP-moderate authorization is not typically required at the time of proposal submission or before award in any event in order to compete in cloud procurements. This requirement was put in specifically for JEDI and the agency explained, Mr. Van Dam explained in his memoranda why this requirement was being included for this particular procurement and the Court of Federal Claims found that to be rational and that was correct. There is a rationale. How do you distinguish Yates with the DOORS system requirement that we found to be a qualification requirement? Well, in Yates, Your Honor, the solicitation issue, it listed specific pre-qualified manufacturers. It put those names in the actual solicitation, which seems to indicate that there was some sort of qualification requirement outside of this particular procurement for Hanger DOORS in order for the agency to get those names that it was listing as pre-qualified. Yes. I mean, if Oracle's interpretation of 2319 and Yates is correct, I mean, this would essentially invalidate all pre-award gate criteria, all gate criteria that are designed to ensure that an offeror can perform the work at issue in that solicitation. You're asking us to assume that the government, again, was innocent of the impact of this qualification requirement. One of the points which constantly comes to mind as one looks at this is with the solicitation of this magnitude, the importance of the public policy aspects of government procurement, which seems to underline the statutes that we're here concerned with, the breadth of the procurement, the scope that seems to go beyond simply saying who's got the best background to do this work. And the question that federal claims seem to be wrestling with is where the boundary is in terms of the judicial role in assuring that procurements comply with the policy of the law as well. Of course, this raises the question as well. We haven't gotten into it of prejudice and the participation in many of the issues that are raised in the briefs. Would you comment particularly on the emphasis that the Oracle's brief makes on the presence of the people who are involved and their connection with potential bidders in this case? It's the Amazon connection. Sure, Your Honor. I can address that. I mean, there's no question. Address the impact on its face that these arguments have on the objectivity of the procurement process. It's true it didn't. I know you're saying your briefs made no difference because they didn't get the contract. But it is a factor that I think is of public significance. Well, sure, Your Honor. And I'll approach that in two ways. One, with regard to the particular sub-factor here that Oracle doesn't meet, or one of them, sub-factor 1.2, in terms of two of the people that Oracle alleged, Mr. Gavin and Mr. DiMartino, there's no allegation that they had anything to do with the gate criteria. With regard to Mr. Ubi, the particular requirement that's at issue here, this FedRAT moderate requirement, that wasn't added to a draft solicitation until after March 2018. The first draft solicitation did not include the FedRAT moderate requirement. So Mr. Ubi was long gone from DOD by the time that this particular requirement was included. More broadly, there's no dispute here that Mr. Ubi's actions and, to a more limited extent, Mr. Gavin's actions were inappropriate in this case. That they violated FAR 3.101 in terms of avoiding the appearance of conflicts of interest. But the FAR gives the contracting officer discretion to determine how to handle these issues, to determine what's the effect of the particular issues that occurred during the process. I mean, just speaking generally, FAR 1.602-2 says that contracting officers are responsible for ensuring performance of all necessary actions for effective contracting. And in order to perform these responsibilities, contracting officers should be allowed wide latitude to exercise business judgment. And that includes ensuring that contractors receive impartial, fair, and equitable treatment. So this responsibility comes to the contracting officer. And FAR 9.505 gets more specific in terms of organizational conflicts of interest in talking about how the exercise of common sense, good judgment, and sound discretion is required in determining whether a significant potential conflict exists, and if it does, developing the appropriate means of resolving it. So, you know, I mean, Oracle's argument here that a potential 18 U.S.C. 208 violation, or excuse me, 10 U.S.C. 208 violation by Mr. Ubi or Mr. Gavin, which incidentally no court or agency has actually found, but their argument that a violation of this statute would mean that the procurement is essentially void. Your Honor, may I continue? No, please continue. Yes, this is important. Yeah, I mean, the idea that this procurement would then be void ab initio, it was flatly rejected in the Godley case. The Godley case specifically said, illegal acts by a government contracting agent do not alone taint a contract and invoke the void ab initio rule. Rather, the record must show some causal link between the illegality and the contract provisions. And Oracle's attempt to distinguish Godley on the basis of that, you know, this case involves, quote, conflicting incentives. I mean, Godley involves a contracting official that pled guilty to bribery. So if that's not a conflicting incentive, then, I mean, nothing is. And so the contracting officer looked at the involvement of these particular individuals, particularly Mr. Ooby, did a very thorough look at Mr. Ooby's involvement in the solicitation. You know, a detailed review of interviews with DOD employees, a detailed review of e-mails, Slack messages, Google Drive documents, culminating in a 28-page no-impact determination. And she determined that Mr. Ooby, you know, while he did, he should not have been participating in the procurement, that ultimately he had no impact. The main reason being that all the key decisions for the Jedi Cloud procurement, such as the actual RFP terms and whether to award one or multiple contracts, were made well after Mr. Ooby recused himself after being vetted by numerous DOD personnel to ensure that the Jedi Cloud RFP truly reflects DOD's requirement. You're telling us that... Okay, I'll proceed. Just what I hear you saying is, never mind if there are facially illegal acts, accepting that these haven't been litigated. But facially illegal acts, you just proceeded. If it turns out in the end it didn't make a difference or arguably didn't make a difference, then never mind the illegal acts are tolerated and need not be remedied along the way, but can be accepted because I don't think anyone has said that the possible conflict was unknown, at least to those who were involved with the alleged conflict. You're saying you just wait and see how it comes out. Well, it certainly was unknown, Your Honor. I'm sorry. It wasn't unknown to them. It wasn't unknown to Mr. Ooby, that's true, but he was misleading the Department of Defense as to... He wasn't telling anyone that he was conducting discussions with Amazon about employment while he was working on Jedi. He gave a completely different explanation for why he recused himself in October 2017. So the contracting officer's duty was then to look at this situation and assess whether this impacts the procurement. And she did a very thorough review of this. And one way to look at this is if there was an impact on the procurement, I mean what if hypothetically Mr. Ooby had written the solicitation himself, what would be the remedy for that? Well, the remedy would presumably be for the agency to go back, take a look at its requirements without Mr. Ooby's involvement and make sure that these are still the requirements or change them if they're not. But the agency has already done that multiple times. It's going through a DPAP review, a review by the Department of Defense Chief Information Officer and reviewed by numerous stakeholders within DOD well after Mr. Ooby had left the government. So the Jedi Cloud requirements are well established and have gone through the review. Counsel, this would all require us to assume that Mississippi Valley is no longer good law. Is that right? Absolutely not, Your Honor. No, Mississippi Valley is still good law, but the Godly Court explained what Mississippi Valley means. It doesn't mean that simply because there was a violation of Section 208 that that alone paints the contract. The contract has to actually result from the illegality, and the Godly Court explained that. This court was obviously in no position to overturn Mississippi Valley and Godly. It was simply explaining what it means, and Oracle simply has a very different view of Mississippi Valley than this court does. Mr. Ray, I have a question, if I may, on going back to the whole issue of Chenery and harmless error. I mean, we've struggled in various cases with the field that is occupied by Chenery as opposed to the field where harmless error has a role to play when the reviewing court finds that there was error, but ultimately finds that the error was not prejudicial. Can you explain why it is that you think in this case the Court of Federal Claims harmless error analysis should apply as opposed to the Chenery doctrine? Thank you, Your Honor. I did want to get back to that. I mean, Chenery is not a harmless error case. The holding of Chenery in these other cases that Oracle is citing is that a court cannot affirm an agency's decision based on a rationale that the agency didn't give. It can't put in its own rationale. It can't say, well, the overarching decision is reasonable because of a reason that the agency didn't give, but the court has determined in its wisdom. But in this case, isn't what Judge Brugink did ultimately was to say  had it been required to do this as a multisource procurement would have kept gate 1.2 in effect? Right, and he based that on the administrative record. That's a proper harmless error analysis. He wasn't saying gate 1.2 is reasonable based on whatever reasons he can come up with. He was saying that if this error had not occurred, then it's likely that gate 1.2 would have remained, this FedRAMP moderate requirement would have remained because in DOD's view, which he found to be reasonable, the security requirements increase in a multiple award situation. And that's a perfectly logical, reasonable, harmless error requirement. And it's the harmless error requirement that's required by this court in cases such as CliniCom, LEND Defense, the WellPoint decision that was just issued a few months ago. I mean, WellPoint's a great example where the court found that even if the offeror should have been given a higher rating for a particular factor,  I mean, there's no suggestion in the WellPoint case that the agency had done this hypothetical analysis with the increased corporate experience and capability rating. But based on the evidence of record, this court was able to say that there's not a substantial chance. A contractor doesn't have to prove it would have won the award if the error hadn't occurred, but it does need to demonstrate a substantial chance or at a minimum that it could have competed. And that's what Oracle... Okay, I understand the position. Okay, but just to complete that thought, I recall Judge Brubing didn't discuss whether the compliance with Gate 112 had to be complete before the initial bidding process. And as we've heard today, Oracle says that they've well over now complied with that threshold requirement. But as to how harmless error also applies to drawing this line, which they tell us was arbitrary, is there anything that you can elaborate on that? Sure. If I think I understand the court's question, it's getting to Oracle's argument that the court was looking at the wrong timeframe, I guess, for the prejudice. In Oracle's view, in other words, the question is whether or not they could compete if there's a remand versus whether or not they were harmed by the actual error. But the solicitation went too far in requiring the compliance before the beginning of bidding. Well, that's Oracle's argument, yes. And if they're correct about that, then that's an issue for us. And our position, as we've explained in the briefing here, our argument is that subfactor 1.2 is, in fact, enforceable. And if subfactor 1.2 is enforceable, getting to the prejudice question, what would have happened if the agency hadn't made this error that the trial court found of invoking an inapplicable exception to the single award prohibition in the statute? And the trial court correctly found that the subfactor 1.2 would not have changed and Oracle would still not be eligible for award in this case. And the idea that we should instead be looking at what might happen in the future on remand, I mean, that raises fundamental fairness concerns in the government procurement context. Just to give an example, let's say a plaintiff came in and argued that the government had conducted improper discussions during the evaluation, that if they had told that particular offer something, they might have changed their proposal. But in looking at that, the court can say, well, there's no way they would have changed their proposal enough to actually get the award at that time. So under a proper prejudice analysis, then you would say they're not prejudiced. But if the question is instead what could they do on remand if the agency is forced to go back and look at those, do those discussions again, well, now they know the winner's price. So now they can set their proposal to try to match the winner after learning all this information during a debriefing. And, you know, that's not the law of the Federal Circuit. The Federal Circuit is what would have happened if the error had not occurred. Cases like Labatt is a great example of that. But it also raises fundamental fairness concerns. If it were simply could you compete in a rebid, that would not be the appropriate standard for that reason as well. Okay. Any more questions for Mr. Rayl? No, thank you. No. Okay. Thank you. Mr. Foreman, you have one minute. Thank you, Your Honor. Thank you, Your Honors. May it please the Court. Your Honors, we reserved only one minute because there's only one issue in the appeal that addresses AWS, and that's Oracle's organizational conflict argument. Now, while Oracle didn't address conflicts during its argument today, it's important to note that in its briefs, Oracle conflates its organizational and its individual conflict arguments. But they're separate and distinct issues that must be evaluated as such. Your Honors, individual conflict arguments concern the actions of individual government employees. In sharp contrast, organizational conflicts concern a company's actions, and they're analyzed under a completely separate set of regulations. Your Honors, those regulations provide the contracting officer with the sole discretion to evaluate and resolve the alleged conflicts. And as we set forth in our brief, the contracting officer here conducted a thorough investigation and concluded that there were no organizational conflicts. And that turned on the fact that AWS did not receive any competitively useful nonpublic information. The Court of Federal Claims correctly held that the CO's determination was rational. Accordingly, Your Honors, the decision below should be affirmed. Any questions for Mr. Foreman? All right, thank you. We'll return to the other side. Let's see for Mr. Holman. Michael, would you enlarge the rebuttal time by the amount we've run over? Okay, for your reference, Your Honor, we exceeded appellee's time by 12 minutes. There was one minute and 17 seconds remaining for appellant's argument, so I could set it for 11 minutes if you'd like. All right, let's start with that. Okay, thank you.  Okay, Mr. Holman. Thank you, Your Honor. I want to pick up really where Mr. Foreman just left off because I think it ties into some things Mr. Rayl said. Indeed, maybe one of the few things I agree with on Mr. Foreman in this case, but there are fundamentally different rules for government conflicts and contractor conflicts that the United States has conflated in its arguments. What we're dealing with primarily when we're talking about Mr. Ooby, Mr. Gavin, and Mr. DiMartino are government conflicts. These are not, Mr. Rayl referenced FAR 9.5. These are not FAR 9.5 conflicts. These are different conflicts, and they're subject to different rules. And one of the very important things to me is that Mississippi Valley is good law, Mississippi Valley is correct law, and Mississippi Valley is indeed quite like this case. I'm sorry, Mr. Holman, Mississippi Valley, it seemed to me after reading it, is a case in which there was a conclusion by the court that the conflict infected, I think that was the court's word, the contract. Isn't it the case that, as Mr. Rayl says, that Godley, and there are several other cases following Godley from our court, say that Mississippi is limited to cases in which the contract was, I think the quote is, tainted by fraud. And the conclusion that was reached in this case was this is not such a contract. Why isn't that a proper reading of Mississippi? Well, Your Honor, let me just say, first of all, if that's where you came out, it wouldn't bother me because I think you would still have to rule in Oracle's favor. But let me tell you why. It wouldn't bother you. I'm trying to find out what is the correct reading of Mississippi Valley. And the reading that we have given in the past is that there is some taint required. Otherwise, if it were a per se rule that the contract is void, if there's any conflict of interest anywhere in the vicinity, then that would just, it seems to me, go way beyond anything that we've recognized as an appropriate sphere for overturning a contract. Well, let me answer that directly, and then I do want to switch back to Godley for one second. But I want to answer that directly. The test, Your Honor, is in 18 U.S.C. section 208. And that's what the court said in Mississippi Valley. And that's what numerous cases have said since. And it's an objective test. And the question is, and it was talked about by this court's predecessor in K&R as well, the question is, on the issue you're talking about, was there personal and substantial participation? And the record, not only all of the facts that we've laid out, but the record itself identifies Mr. Ooby as personally and substantially participating in JEDI. That is 18 U.S.C. 208. And that's the objective test that Congress… What I'm focusing on here is the language, particularly language from Godley, that says the record must show some causal link between the illegality and the contract provisions. Now, Mr. Ooby may have been involved to some extent, at least early on, in the negotiations, internal negotiations over the form that the procurement should take. But if the conclusion is correct that was reached by the contracting officer and sustained by the COFC that there was no taint from his participation, then isn't that the correct rule to apply in the case of a conflict and its effect on the contract? Before we even get to the question of whether it had an effect, just looking at the rule, isn't that a correct statement of the proper rule? I think that the test that Congress set, Your Honor, was meant to be objective precisely because people hide. This is the teaching of Mississippi Valley is that people who are doing things improper don't admit them. They're not going to put them out in the public. That's why Congress set an objective test as if a person is personally and substantially involved. It doesn't matter. It's not what they did. It's are they personally and substantially involved such that they could have an impact on this because by the very nature somebody who is violating the law is going to hide what they're doing. What's complicated in this case, what becomes more complicated in this case, is that indeed the contracting officer who's making the findings that Your Honor is seeking to rely on was found by the Court of Federal Claims to have missed these conflicts in the first place. The contracting officer was responsible for this. That's why Mississippi Valley says Congress didn't empower the agency to review the 18 U.S.C. issue because the very people who missed this conflict and who, excuse me, made this mistake in this procurement are the very ones who were writing things saying we didn't hurt anybody by the mistake we made. And that's not 18 U.S.C. I mean isn't the principle, with respect to Mr. Ooby at least, isn't the principle source of missing the conflict was that they were operating under a misapprehension which was generated by Mr. Ooby as to the nature of his interaction with AWS, which AWS later corrected. I think it's unquestionable, Your Honor, from the record. And then the contracting officer looked at the issue again, right? It's unquestionable, Your Honor, that Mr. Ooby lied to the Department of Defense. That's unquestionable. But indeed nobody screened Mr. Ooby, which is a Department of Defense DFARS requirement. Nobody got Mr. Ooby to sign his conflict of interest statement prior to participating in the procurement, which he was required to do. None of that occurred in this case. So in this $10 billion procurement, one of the four people that was leading it, and that's their description of him, one of the four people leading JEDI, was set onto this procurement, this $10 billion procurement, with nobody screening him for conflicts of interest and no MDA in place. He then proceeded to lie about this stuff to DOD, no doubt about it. But let me tell you the other thing that's important that goes to what you said, because you said the Court of Federal Claims, the CO found something, and the Court of Federal Claims agreed on impact. Let's be clear what happened. The contracting officer, after this had to get sent back on remand and after the memorandum analysis, said that Mr. Ooby didn't impact this procurement. In particular, one of the things we focus on is the single award decision, which he was the architect of and the person driving it inside DOD. The contracting officer, when you read her memorandum, says Mr. Ooby didn't impact that because the decision wasn't made until summer of 2018, after April 2018, summer of 2018, when Secretary Lord signs the DNS. There's reams of evidence to the contrary in the record. So what the Court of Federal Claims said, and this, again, breaking with Supreme Court precedent, breaking with this court's precedent in OMV, the lower court said the single award decision had left the train before the procurement started. So the court, looking at the same record, that the CO says the decision is not made until summer of 2018, the lower court concludes that the award decision was made before the procurement started. And there's no way to reconcile these two facts. And when you look through the record, what you're going to see is that Ooby was the architect of the single award decision, which AWS was the only competitor pressing at the time. He was actively lobbying the people. This is all through the record, and there is no way to say that Mr. Ooby did not impact this procurement. And that's why there's been so much public outcry about this particular issue, Your Honor. And that is the harm that Mississippi Valley was telling us that Congress was trying to avoid, and that, indeed, that the courts needed to try and avoid, which was a lack of public trust in the procurement because of a conflicted government official. And here we have somebody who's not only negotiating with AWS while it's involved in the procurement. It's communicating with AWS. AWS came in and met with Mr. Ooby while Mr. Ooby was cloaked in Department of Defense clothes. Nobody got told. AWS came in and met about the procurement. AWS didn't tell DOD. Ooby didn't tell DOD. No one told DOD. And, indeed, this is not a procurement that can survive an objective test because, at the end of the day, that's what needs to be applied here under Section 208. I want to just very quickly touch on Godley because it's important. The government keeps relying on Godley. And, you know, it's important to note that, in Godley, what was happening was the government was asking this court to reverse the lower court for not finding a contract void ab initio. And this court did that. And Godley didn't involve a Section 208 finding. It did involve references to Mississippi Valley. But there's nothing helpful when you read Godley for what it is, which is the United States saying to this court in Godley that it's imperative with these type of contracts that we have the ability to find them void ab initio. Because it's convenient in this large procurement for Mr. Rayl to stand in front of you and tell this court a different thing today doesn't mean what the Department of Justice was telling this court in Godley, reverse the lower court. We can't have these kind of tainted contracts is not the correct policy. Congress has spoken to Section 208. Through Section 208, the Supreme Court has spoken to this issue in Mississippi Valley. If I could very quickly turn to FedRAMP, I want to touch on some of the points about Gate 1-2 that Mr. Rayl made. First of all, FedRAMP quite clearly is not a JEDI requirement. DOD repeatedly has admitted that. It's clear in the solicitation. Why? Because it takes too long to get through FedRAMP. They're not using FedRAMP to perform this contract. It is not a specification of performance. Indeed, FedRAMP itself prohibited – if you went to the FedRAMP site when DOD was issuing this procurement, you would have seen a note up here on FedRAMP that they couldn't do exactly what they did, which was use it as a gating requirement. That's why it doesn't exist in other procurements. It's because FedRAMP prohibited it, and they went and they did it anyways. I hear that my time has expired. Let me ask, are there any more questions at all? No. No. Okay. Thank you all. The case is submitted.